STATE of Wisconsin, Plaintiff-Respondent,

v.

Paul RUTZINSKI, Defendant-Appellant-Petitioner.

Supreme Court

*No. 98–3541–CR. Oral argument November 2, 2000.—Decided March 20, 2001.*

2001 WI 22

(Also reported in 623 N.W.2d 516.)

For the defendant-appellant-petitioner there were briefs by *Craig A. Mastantuono, Maureen B. Fitzgerald* and *Fitzgerald & Mastantuono, S.C.*, Milwaukee, and oral argument by *Craig A. Mastantuono*.

For the plaintiff-respondent the cause was argued by *Warren D. Weinstein*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

¶ 1. JON P. WILCOX, J. This case requires us to decide under what circumstances a cell-phone call from an unidentified motorist provides sufficient justification for an investigative traffic stop. Relying on information obtained from such a call, a Greendale police officer, Jerome Sardina (Officer Sardina), made an investigative traffic stop of the petitioner, Paul Rutzinski (Rutzinski). During this stop, Officer Sardina obtained evidence that Rutzinski was operating his motor vehicle while intoxicated.

¶ 2. Rutzinski subsequently moved to suppress the evidence obtained during the traffic stop, arguing that the information in the motorist's call was not sufficiently reliable to justify the stop and, therefore, the stop was unreasonable under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution. The Circuit Court for Milwaukee County, Jeffery A. Kremers, Judge, denied

732

Rutzinski's motion and entered a judgment of conviction, finding Rutzinski guilty of illegally operating a motor vehicle while intoxicated. The court of appeals, in *State v. Rutzinski*, No. 98–3541–CR, unpublished slip op. (Wis. Ct. App. May 11, 1999), affirmed the circuit court judgment.

¶ 3. For the reasons set forth below, we hold that under the circumstances of this case, the information in the motorist's call provided sufficient justification for an investigative stop of Rutzinski. Accordingly, we affirm the decision of the court of appeals.

I

¶ 4. The relevant facts are undisputed. On February 12, 1998, at approximately 10:00 p.m., Officer Sardina was on patrol in Greenfield near 68th Street and Grange Avenue when he overheard a police dispatch requesting a squad to respond to the area of 51st Street and Grange Avenue. According to the dispatch, an unidentified motorist calling from a cell phone reported that he or she was observing a black pickup truck weaving within its lane, varying its speed from too fast to too slow, and "tailgating." Officer Sardina responded to the dispatch.

¶ 5. The dispatcher then issued a second dispatch, indicating that the motorist was still on the phone, and he or she and the black pickup had traveled to 60th Street and Grange Avenue. In light of this information, Officer Sardina determined that the vehicles were heading toward him. Hence, he positioned his squad car in the median and waited.

¶ 6. Shortly thereafter, Officer Sardina saw the vehicles pass his location. He then pulled his squad car behind the black pickup. Upon doing so, the dispatcher stated that the motorist had indicated that he or she

was in the vehicle ahead of the truck and saw Officer Sardina's squad car, and that Officer Sardina was following the correct truck.

¶ 7.   Although Officer Sardina did not independently observe any signs of erratic driving, he then activated his emergency lights and conducted a traffic stop of the black pickup. During this stop, Officer Sardina observed that Rutzinski, the driver of the pickup, had glassy, bloodshot eyes, smelled like alcohol, and was slurring his speech. A subsequent Intoxilyzer test revealed that Rutzinski had a .21 blood-alcohol concentration. The motorist who had reported Rutzinski's erratic driving also pulled over when Officer Sardina initiated the stop. Although the motorist did not speak with Officer Sardina, he or she did speak at that time with Officer Sardina's supervisor. However, there is no record of the motorist's name or other identification, or any indication of what was said between Officer Sardina's supervisor and the motorist.

¶ 8.   In light of the evidence obtained as a result of Officer Sardina's stop, the State charged Rutzinski with one count of operating a motor vehicle while under the influence of an intoxicant, fourth offense, and one count of operating a motor vehicle with a prohibited alcohol concentration, fourth offense. In response, Rutzinski filed a motion to suppress the evidence obtained as a result of the stop. Rutzinski argued that the unidentified motorist's call did not present reliable and credible grounds upon which to justify the stop. And because the call provided Officer Sardina's sole basis for the stop, Rutzinski contended, the stop was unreasonable under the Fourth Amendment and Article I, Section 11.

¶ 9. The trial court denied Rutzinski's motion. Thereafter, Rutzinski pled "no contest" to one count of operating a motor vehicle while under the influence of an intoxicant, fourth offense.[1] The circuit court accepted Rutzinski's plea and entered judgment accordingly.

¶ 10. Rutzinski then appealed the circuit court's judgment of conviction, again arguing that the traffic stop violated the Fourth Amendment and Article I, Section 11.[2] On May 11, 1999, the court of appeals rejected Rutzinski's argument and affirmed the circuit court judgment. *Rutzinski*, unpublished slip op. at 3.

¶ 11. Rutzinski thus petitioned this court for review, which we granted.

## II

¶ 12. Rutzinski asks this court to determine whether Officer Sardina's stop violated the Fourth Amendment of the United States Constitution[3] and

---

[1] The circuit court dismissed the second count based on Rutzinski's plea and judgment of conviction on count one.

[2] Pursuant to Wis. Stat. § 971.31(10) (1999–2000), an appellate court may review during an appeal from a judgment of conviction an order denying a motion to suppress evidence, notwithstanding the fact that the trial court entered the judgment of conviction upon the defendant's plea of no contest. *See State v. Princess Cinema of Milwaukee*, 96 Wis. 2d 646, 648–49, 292 N.W.2d 807 (1980).

[3] The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

735

Article I, Section 11 of the Wisconsin Constitution.[4] This requires us to apply the undisputed facts to constitutional standards. As such, this case presents a question of law, which we review de novo. *State v. Jackson*, 147 Wis. 2d 824, 829, 434 N.W.2d 386 (1989).

¶ 13. To date, we consistently have conformed our interpretation of Article I, Section 11 and its attendant protections with the law developed by the United States Supreme Court under the Fourth Amendment. *State v. Secrist*, 224 Wis. 2d 201, 208, 589 N.W.2d 387 (1999). Under both provisions, the constitutional imperative is that all searches and seizures be objectively reasonable under the circumstances existing at the time of the search or seizure. *Whren v. United States*, 517 U.S. 806, 810 (1996); *State v. Waldner*, 206 Wis. 2d 51, 55–56, 556 N.W.2d 681 (1996).

¶ 14. Investigative traffic stops, regardless of how brief in duration, are governed by this constitutional reasonableness requirement. *Whren*, 517 U.S. at 809–10; *State v. Guzy*, 139 Wis. 2d 663, 674–75, 407 N.W.2d 548 (1987). In accordance with this requirement, a police officer may temporarily stop a suspicious

---

describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is enforceable against the states by means of the Due Process clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

[4] Article I, Section 11 of the Wisconsin Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

vehicle to maintain the status quo while determining the identity of the driver or obtaining other relevant information. *United States v. Hensley*, 469 U.S. 221, 226 (1985); *Guzy*, 139 Wis. 2d at 675. However, to pass muster under the Fourth Amendment and Article I, Section 11, an officer initiating an investigative stop must have, at a minimum, a reasonable suspicion that the driver or occupants of the vehicle have committed an offense. *Hensley*, 469 U.S. at 228; *Guzy*, 139 Wis. 2d at 675. As the United States Supreme Court first articulated in *Terry v. Ohio*, 392 U.S. 1, 27 (1968), this requires that the stop be based on something more than the officer's "inchoate and unparticularized suspicion or 'hunch.' " At the time of the stop, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, objectively warrant a reasonable person with the knowledge and experience of the officer to believe that criminal activity is afoot.[5] *Id.* at 21–22, 27; *Hensley*, 469 U.S. at 226; *Waldner*, 206 Wis. 2d at 55.

---

[5] The Wisconsin legislature codified the *Terry* standard in Wis. Stat. § 968.24 (1997–98):

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

As we previously have explained, § 968.24 must be interpreted in light of *Terry* and the cases following it. *State v. Jackson*, 147 Wis. 2d 824, 831, 434 N.W.2d 386 (1989).

All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

¶ 15. When reviewing a set of facts to determine whether those facts could give rise to a reasonable suspicion, courts should apply a commonsense approach to strike a balance between the interests of the individual being stopped to be free from unnecessary or unduly intrusive searches and seizures, and the interests of the State to effectively prevent, detect, and investigate crimes. *Hensley*, 469 U.S. at 228; *Waldner*, 206 Wis. 2d at 56. In every case, a reviewing court must undertake an independent objective analysis of the facts surrounding the particular search or seizure and determine whether the government's need to conduct the search or seizure outweighs the searched or seized individual's interests in being secure from such police intrusion. *Hensley*, 469 U.S. at 228; *State v. McGill*, 2000 WI 38, ¶ 18, 234 Wis. 2d 560, 609 N.W.2d 795; *Waldner*, 206 Wis. 2d at 56.

### III

¶ 16. In the present case, Rutzinski does not dispute that Officer Sardina could have initiated an investigative traffic stop if he personally had observed Rutzinski's alleged erratic driving. However, as Rutzinski correctly indicates, Officer Sardina did not personally observe any suspicious driving; rather, he relied upon the motorist's tip to form a reasonable suspicion. This tip, Rutzinski argues, did not provide sufficient information to justify the stop.

¶ 17. In some circumstances, information contained in an informant's tip may justify an investigative stop. *See Adams v. Williams*, 407 U.S. 143, 147 (1972) (rejecting the argument "that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on informa-

tion supplied by another person"). However, informants' tips vary greatly in reliability. Thus, before an informant's tip can give rise to grounds for an investigative stop, the police must consider its reliability and content.

¶ 18. Tips should exhibit reasonable indicia of reliability. *Cf. Illinois v. Gates*, 462 U.S. 213, 233 (1983) (applying same standard to probable cause determination). In assessing the reliability of a tip, due weight must be given to: (1) the informant's veracity; and (2) the informant's basis of knowledge. *Id.* at 230. These considerations should be viewed in light of the "totality of the circumstances," and not as discrete elements of a more rigid test: "[A] deficiency in one [consideration] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. Although there is no per se rule of reliability, these considerations outline a general spectrum of potential types of tips that, under specific circumstances, can give rise to a reasonable suspicion.

¶ 19. On one end of the spectrum are cases in which the police receive a tip from an informant whom they are reasonably justified in believing to be truthful. The United States Supreme Court examined this situation in *Adams v. Williams*, 407 U.S. 143. In *Adams*, an informant approached a police officer and indicated that a particular individual in a nearby vehicle was in possession of drugs and a gun. *Id.* at 144–45. The officer personally knew the informant, and the informant had provided the officer with information in the past. *Id.* at 144, 146. Thus, based on the informant's tip, but without independently investigating or corroborating any of the facts therein, the officer located the individual identified in the tip and conducted an

investigative stop and protective pat-down for weapons. *Id.* at 145. As a result, the police obtained incriminating evidence. *Id.* at 145.

¶ 20. Upon review of a motion to suppress the evidence obtained as a result of the stop, the Supreme Court held that the informant's tip was sufficiently reliable *to justify the stop. Id.* at 149. First, the Court explained that because the informant had provided the officer information in the past and "came forward personally to give information that was immediately verifiable at the scene," the officer had some opportunity to assess informant's veracity. *Id.* at 146. Second, the Court reasoned that because the tip came from an informant whom the investigating officer personally knew, the officer could have arrested the informant for giving a false tip had the tip proven to be untrue. *Id.* at 146–47. This threat of potential arrest, the Court explained, could lead a reasonable officer to conclude that the informant would not provide a false tip; in other words, the officer could presume that the informant's tip was reliable. *Id.* at 147. In light of these considerations, the Court upheld the stop without undertaking any further analysis to determine the informant's basis of knowledge. *Id.* at 146–47.

¶ 21. *Adams* illustrates that in some circumstances, an informant's veracity can afford a tip with sufficient reliability to justify an investigative stop. That is, if there are strong indicia of the informant's veracity, there need not necessarily be any indicia of the informant's basis of knowledge.

¶ 22. At the other end of the spectrum are cases where a totally anonymous informant provides the police with a tip which, through independent police investigation or other corroboration, indicates that the informant possesses "inside information." The

Supreme Court examined this scenario in *Alabama v. White*, 496 U.S. 325 (1990). In that case, the police received an anonymous telephone call stating that the defendant would leave a particular address "at a particular time in a brown Plymouth station wagon with the right taillight lens broken," drive to a certain named motel, and be in possession of a brown attach case containing approximately one ounce of cocaine. *Id.* at 327. Based on this information, the police proceeded to the address indicated by the informant and located a station wagon matching the vehicle described in the tip. *Id.* At approximately the time indicated by the informant, the officers observed the defendant leave the building and enter the station wagon. *Id.* The officers then followed the defendant's vehicle as it headed along the most direct route to the motel named in the tip. *Id.* Just prior to reaching the motel, the officers stopped the defendant and undertook a consensual search of her car. *Id.* During this search, the officers located the attaché case, which they found to contain marijuana and cocaine. *Id.* The defendant subsequently moved to suppress the evidence obtained as a result of the search, contending that the officers did not have a reasonable suspicion to conduct the initial investigative stop. *Id.* at 327–28.

¶ 23. On review, the Court held that although this was "a close case," under the circumstances, the anonymous tip, as corroborated by the officers, "exhibited sufficient indicia of reliability to justify the investigatory stop." *Id.* at 332. The Court explained that "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 330. It then noted that the tip at issue, in itself, provided virtually no

indication of the informant's veracity or basis of knowledge. *Id.* at 329. Accordingly, "something more" than the tip was required. *Id.* (quoting *Gates*, 462 U.S. at 227).

¶ 24.   However, the Court further noted that the informant's tip not only contained easily obtainable facts such as the defendant's whereabouts or the type of car she drove, but also predicted the defendant's future behavior—that she would leave at a certain time and drive to a particular motel. *Id.* at 332. These predictions were important, the Court explained, because once the accuracy of the predictions was verified, the police reasonably could infer that the informant had "inside information." *Id.* That is, when the police verified the predictions, they had reason to believe that the informant had a firm basis of knowledge. This basis of knowledge, the Court concluded, provided the tip with sufficient indicia of reliability to justify the investigative stop. *Id.* Hence, although the initial anonymous tip did not, in itself, justify an investigative stop, the corroboration of the informant's predictions did.

¶ 25.   *White* illustrates that in cases where the police receive a tip from an unidentifiable informant, the tip nonetheless may be deemed reliable if it contains "inside information" or a similar verifiable explanation of how the informant came to know of the information in the tip, which the police in turn independently corroborate. Stated another way, if a tip contains strong indicia of an informant's basis of knowledge, there need not necessarily be any indicia of the informant's veracity.

¶ 26.   We are mindful, however, that the *Adams* and *White* analyses do not create a per se rule by which to judge the objective reasonableness of an investigative stop based on an informant's tip. As stated above,

when assessing whether a stop is constitutionally reasonable, a reviewing court must balance the interests of the individual being stopped against the interests of the State to effectively root out crime. *Hensley*, 469 U.S. at 228; *McGill*, 2000 WI 38, at ¶ 18; *Waldner*, 206 Wis. 2d at 56. In light of this balancing test, we recognize that there may be circumstances where an informant's tip does not exhibit indicia of reliability that neatly fit within the bounds of the *Adams-White* spectrum, but where the allegations in the tip suggest an imminent threat to the public safety or other exigency that warrants immediate police investigation. In such circumstances, the Fourth Amendment and Article I, Section 11 do not require the police to idly stand by in hopes that their observations reveal suspicious behavior before the imminent threat comes to its fruition. Rather, it may be reasonable for an officer in such a situation to conclude that the potential for danger caused by a delay in immediate action justifies stopping the suspect without any further observation. Thus, exigency can in some circumstances supplement the reliability of an informant's tip in order to form the basis for an investigative stop. *Cf. City of Indianapolis v. Edmond*, 121 S. Ct. 447, 455 (2000) (noting that exigencies of some scenarios likely would outweigh the individual's right to be free from an investigative traffic stop).

## IV

¶ 27. The Supreme Court recently examined the limits of the *White-Adams* reliability spectrum in *Florida v. J.L.*, 529 U.S. 266 (2000). In *J.L.*, the police received an anonymous telephone call reporting "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268.

The police had no audio recording of the call, nor did they know anything about the informant. *Id.* Nonetheless, based on the allegation and information in the tip, two officers proceeded to the bus stop, located a black male wearing a plaid shirt, and, without independently observing any suspicious behavior, initiated an investigative stop of that person. *Id.* As a result of the stop, the police discovered that the suspect was carrying a concealed weapon without a license and while under the age of eighteen, thus violating Florida law. *Id.* at 268–69. The suspect later moved to suppress evidence of the gun, arguing that the police discovered it as a result of an unconstitutional stop based on an unreliable anonymous tip. *Id.* at 269.

¶ 28.    On review, the Supreme Court ruled that the stop was unconstitutional. *Id.* at 274. The Court explained that this case involved a totally anonymous tip. *Id.* at 270. Thus, unlike the tip in *Adams* "from a known informant whose reputation [could] be assessed and who [could] be held responsible if her [or his] allegations turn out to [have been] fabricated," the tip in this case failed to demonstrate the informant's veracity. *Id.* For this reason, the Court explained, the police were required under *White* to corroborate the tip. *Id.* However, to corroborate a tip, the Court further explained, the police must do more than verify easily obtainable information that tends to identify the suspect; they must verify information that tends to indicate the informant's basis of knowledge about the suspect's alleged illegal activity. *Id.* at 271–72. Hence, a totally anonymous tip must contain not only a bald assertion that the suspect is engaged in illegal activity (*e.g.*, that the suspect illegally possesses a gun), but also verifiable information indicating how the tipster came to know of the alleged illegal activity (*i.e.*, the

informant's basis of knowledge). *Id.* at 272; *see also White*, 496 U.S. at 331–32. In this case, the Court noted, the anonymous tip did not contain any information such as a prediction regarding the suspect's future behavior which, if corroborated, would indicate the informant's basis of knowledge. *J.L.*, 529 U.S. at 271. Rather, "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he [or she] knew about the gun nor supplied any basis for believing he [or she] had inside information about [the suspect]." *Id.* Thus, the Court concluded that the tip failed under *White* analysis. *Id.* at 271.

¶ 29.    Further, the Court rejected Florida's argument that the content of a tip alleging that a suspect possesses a firearm necessarily entails such exigency that it warrants an exception to the general rule that tips must exhibit indicia of reliability. *Id.* at 272. The Court noted that "[f]irearms are dangerous, and extraordinary dangers sometimes justify unusual precautions." *Id.* However, it reasoned that a firearms exception would create a rule under which any person seeking to harass another individual could simply allege that the individual possesses a gun. *Id.* The Court explained: "As we clarified when we made indicia of reliability critical in *Adams* and *White*, the Fourth Amendment is not so easily satisfied."[6] *Id.* at

---

[6] Although the Court refused to adopt Florida's proposed firearms exception, it carefully limited its holding to the facts of the case:

> The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a person carrying a firearm before the police can constitutionally

273. Accordingly, the Court held that the anonymous tip did not give rise to a reasonable suspicion to conduct the stop and, therefore, the stop was constitutionally unreasonable. *Id.* at 274.

¶ 30. In the present case, Rutzinski analogizes Officer Sardina's investigative traffic stop to the stop in *J.L.* First, he points out that Officer Sardina, like the officers in *J.L.*, did not independently observe any suspicious behavior. Second, he contends that like the tip in *J.L.*, the tip at issue here came from an unidentified informant who provided no predictions regarding Rutzinski's future conduct. As such, Officer Sardina could neither presume that the informant was being truthful, nor could he conclude that the informant had inside information about whether Rutzinski was intoxicated. And third, Rutzinski asserts that under *J.L.*, this court cannot create a constitutional "drunk driving" exception to the *Adams-White* reliability requirement. For these reasons, and based on the Supreme Court's holding in *J.L.*, Rutzinski contends that although the informant's tip in this case may have given Officer Sardina grounds to investigate the situation and perhaps form a reasonable suspicion based on facts that he personally may have observed, the tip did not, in itself, provide a reasonable basis for Officer Sardina's investigative stop. Therefore, Rutzinski

conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports. . .and schools. . ., cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.

*Florida v. J.L.*, 529 U.S. 266, 273–74 (2000) (citations omitted). In doing so, the Court implicitly affirmed that there are circumstances in which exigency can supplement—or, in very extreme circumstances, possibly supplant—the *Adams-White* reliability analysis.

claims that the stop violated the Fourth Amendment and Article I, Section 11.

¶ 31.  We reject Rutzinski's arguments. To be sure, Officer Sardina did not independently observe any suspicious behavior. But the present case involves a very different set of facts than those in *J.L.*

¶ 32.  First, unlike the caller in *J.L.*, the informant in this case exposed him- or herself to being identified. The informant indicated to the police prior to the stop that he or she was in the vehicle in front of Rutzinski's pickup. Officer Sardina thus could infer that by revealing that he or she was in a particular vehicle, the informant understood that the police could discover his or her identity by tracing the vehicle's license plates or directing the vehicle to the side of the road.[7] That is, like the officer in *Adams*, Officer Sardina could reasonably have concluded that the informant knew that he or she potentially could be arrested if the tip proved to be fabricated.[8] *Accord United States v. Sierra-Hernandez*, 581 F.2d 760, 763 (9th Cir. 1978) (Kennedy, J.) (holding that by "presenting himself to the [police] and doing so while driving a car from which his identity might easily be traced, the

---

[7] The informant did pull to the side of the road when Officer Sardina initiated the stop. However, Officer Sardina did not ask the informant to do so, and we cannot infer from the record that Officer Sardina expected this result. Consequently, we do not consider this fact in assessing the constitutionality of the stop.

[8] Section 946.41 of the Wisconsin Statutes provides in part that it is a Class A misdemeanor to knowingly give false information to a police officer while the officer is doing any act in an official capacity and with lawful authority. Similarly, Wis. Stat. § 146.70 establishes a penalty for intentionally dialing "911" to report an emergency while knowing that the alleged fact situation does not exist.

[unidentified] informant was in a position to be held accountable for his intervention"); *State v. Slater*, 986 P.2d 1038, 1043 (Kan. 1999) (holding and providing cites for cases from several jurisdictions which hold that tips from unidentified informants generally are reliable when "the informant gives enough information that his or her identity may be ascertained"). As explained in *Adams*, this threat of arrest could lead a reasonable police officer to conclude that the informant is being truthful.

¶ 33.  Second, unlike the caller in *J.L.*, the informant in this case provided the police with verifiable information indicating his or her basis of knowledge. The informant explained that he or she was making personal observations of Rutzinski's contemporaneous actions. Additionally, the informant provided not only a description of Rutzinski's vehicle and the direction in which it was traveling, but also indicated the time at which Rutzinski's vehicle passed specific locations as it progressed toward Officer Sardina, Officer Sardina's arrival on the scene, and that Officer Sardina was following a black pickup. While many people may have been able to identify Rutzinski's vehicle and the general direction in which it was traveling, only a person contemporaneously observing the vehicle or possessing "inside information" (for example, a person in contact with Rutzinski at the time in question) would have been able to indicate where the vehicle was located and the setting surrounding the vehicle at the given time. Thus, Officer Sardina reasonably could have inferred from this information that the informant had a reliable basis of knowledge.

¶ 34.  And third, unlike the tip in *J.L.*, the tip in the present case suggested that Rutzinski posed an imminent threat to the public's safety. The informant

in this case alleged that Rutzinski was driving erratically. Erratic driving is one possible sign of intoxicated use of a motor vehicle. *State v. Swanson*, 164 Wis. 2d 437, 453 n.6, 475 N.W.2d 148 (1991). As such, based on the reliability of and the allegations contained in the informant's tip, Officer Sardina reasonably could have suspected that Rutzinski was intoxicated. Accordingly, Officer Sardina was justified in initiating an investigative traffic stop of Rutzinski.

¶ 35. Rutzinski responds that Officer Sardina nonetheless should have waited until he personally observed signs that Rutzinski may have been intoxicated before initiating the traffic stop. But this argument ignores the tremendous potential danger presented by drunk drivers. As the Vermont Supreme Court recently explained in a case with a strikingly similar fact pattern to the case at hand:

> In contrast to the report of an individual in possession of a gun [as in *J.L.*], an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action. In the case of a concealed gun, the possession itself might be legal, and the police could, in any event, surreptitiously observe the individual for a reasonable period of time without running the risk of death or injury with every passing moment. An officer in pursuit of a reportedly drunk driver on a freeway does not enjoy such a luxury. Indeed, a drunk driver is not at all unlike a "bomb," and a mobile one at that.

*State v. Boyea*, 765 A.2d 862, 867 (Vt. 2000); *see also State v. Tucker*, 878 P.2d 855, 864 (Kan. Ct. App. 1994) ("The risk of danger presented to the public by a drunken driver is so great that we cannot afford to

impose strict, verifiable conditions on an anonymous tip before an investigatory stop can be made in response to such a tip."); *State v. Melanson*, 665 A.2d 338, 340 (N.H. 1995) (considering exigency of situation created by alleged drunk driving in holding traffic stop based on tip by unidentified informant to be constitutional); *State v. Stolte*, 991 S.W.2d 336, 343 (Tex. Ct. App. 1999) (considering the "immediate threat to public safety" caused by drunk drivers in upholding an investigative stop based on information in an informant's tip); *cf. Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451–55 (1990) (holding that "the magnitude of the drunken driving problem or the States' interest in eradicating it" outweighs individuals' rights to be free from traffic stops at sobriety checkpoints).[9] In light of the potential for imminent danger that drunk drivers present, the informant's allegations suggesting that Rutzinski may have been intoxicated supple-

---

[9] In 1999 the United States suffered 15,786 fatalities in alcohol-related traffic accidents—an average of one fatality every thirty-three minutes. National Highway Traffic Safety Administration, United States Dept. of Transp., *Traffic Safety Facts 1999* 1 (2000), *available at* http://www.nhtsa.dot.gov/people/ncsa/pdf/Alcohol99.pdf. These fatalities comprised thirty-eight percent of all traffic fatalities for that year. *Id.* Further, during 1999 "[a]n estimated 308,000 persons [nationwide] were injured in crashes where police reported that alcohol was present—an average of one person injured approximately every 2 minutes." *Id.*

The same year, there were 309 fatalities in Wisconsin as a result of alcohol-related traffic accidents. *Id.* at 7. This represents forty-one percent of all traffic fatalities in Wisconsin for 1999. *Id.*

mented the reliability of the tip, and further justified Officer Sardina's investigative stop.[10]

¶ 36.   This is not to suggest that we advocate a blanket rule excepting tips alleging drunk driving from the *Adams-White* reliability requirement. As the Supreme Court explained in *J.L.*, the Constitution is not so easily satisfied. Rather, we merely acknowledge the Supreme Court's caveat that "extraordinary dangers sometimes justify unusual precautions." *J.L.*, 120 S. Ct. at 1379. Because drunk driving is an extraordinary danger, we cannot adopt Rutzinski's position that the police must dismiss allegations of possible drunk driving when assessing whether an informant's tip justifies a traffic stop. While such allegations cannot form the sole basis for an investigative stop, they certainly must be considered when examining the totality of the circumstances surrounding particular police conduct.

¶ 37.   For these reasons, Officer Sardina's investigative stop of Rutzinski does not implicate the same constitutional deficiencies present in the police action in *J.L.* Unlike the tip in *J.L.*, the informant's tip in this case contained sufficient indicia of reliability and alleged a potential imminent danger to public safety. These factors substantially outweighed the minimal intrusion that the stop would have presented had

---

[10] To be sure, intoxication is not the only possible cause of erratic driving. Erratic driving can be the result of something as innocuous as the driver waving at a bee in the car or something as serious as the driver having a heart attack. But regardless of the cause, erratic driving can be very dangerous and often is symptomatic of intoxication. *State v. Swanson*, 164 Wis. 2d 437, 453 n.6, 475 N.W.2d 148 (1991). For these reasons, an officer may make a traffic stop to investigate observations or reliable reports of erratic driving.

Rutzinski indeed not been intoxicated. Therefore, we hold that Officer Sardina acted reasonably in conducting the investigative stop.

## V

¶ 38. In sum, we hold that the tip in this case provided sufficient justification for an investigative stop of Rutzinski. First, the tip contained sufficient indicia of the informant's reliability: the information in the tip exposed the informant to possible identification and, therefore, to possible arrest if the tip proved false; the tip reported contemporaneous and verifiable observations regarding Rutzinski's alleged erratic driving, location, and vehicle's description; and Officer Sardina verified many of the details in the informant's tip. Second, the allegations in the tip could suggest to a reasonable police officer that Rutzinski was operating his vehicle while intoxicated. This exigency strongly weighs in favor of immediate police investigation. For these reasons, we conclude that the stop did not violate the Fourth Amendment or Article I, Section 11, and we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 39. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. I agree with the majority's conclusion that the tip in this case provided sufficient justification for an investigative traffic stop for driving while intoxicated.

¶ 40. Not all tips, however, will provide sufficient justification to enable law enforcement officers to conduct an investigative traffic stop. *See* majority op. at ¶ 36.

¶ 41.   Case law from other states shows that law enforcement units have adopted policies regarding tips of drunk or erratic driving that help to ensure that resulting traffic stops are lawful. For example, police dispatchers in Texas ask an anonymous caller alleging drunk or erratic driving to pull over at the scene. *See, e.g., State v. Stolte*, 991 S.W. 2d 336, 340 (Tex. Ct. App. 1999). Law enforcement units in Wisconsin might consider adopting policies to promote the reliability of tips.