# SUPREME COURT OF THE UNITED STATES

### VIRGINIA *v.* JOSEPH A. MOSES HARRIS, JR.

#### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF VIRGINIA

No. 08–1385.    Decided October 20, 2009

The petition for a writ of certiorari is denied.

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA joins, dissenting from denial of certiorari.

Every year, close to 13,000 people die in alcohol-related car crashes—roughly one death every 40 minutes. See Dept. of Transp., Nat. Hwy. Traffic Safety Admin., Traffic Safety Facts, 2007 Traffic Safety Annual Assessment—Alcohol-Impaired Driving Fatalities 1 (No. 81106, Aug. 2008). Ordinary citizens are well aware of the dangers posed by drunk driving, and they frequently report such conduct to the police. A number of States have adopted programs specifically designed to encourage such tips—programs such as the "Drunkbusters Hotline" in New Mexico and the REDDI program (Report Every Drunk Driver Immediately) in force in several States. See Dept. of Transp., Nat. Hwy. Traffic Safety Admin., Programs Across the United States That Aid Motorists in the Reporting of Impaired Drivers to Law Enforcement (2007).

By a 4-to-3 vote, the Virginia Supreme Court below adopted a rule that will undermine such efforts to get drunk drivers off the road. The decision below commands that police officers following a driver reported to be drunk *do nothing* until they see the driver actually do something unsafe on the road—by which time it may be too late.

Here, a Richmond police officer pulled Joseph Harris over after receiving an anonymous tip that Harris was driving while intoxicated. The tip described Harris, his car, and the direction he was traveling in considerable detail. The officer did not personally witness Harris vio-

late any traffic laws. When Harris was pulled over, how-
ever, he reeked of alcohol, his speech was slurred, he
almost fell over in attempting to exit his car, and he failed
the sobriety tests the officer administered on the scene.
Harris was convicted of driving while intoxicated, but the
Virginia Supreme Court overturned the conviction. It
concluded that because the officer had failed to independ-
ently verify that Harris was driving dangerously, the stop
violated the Fourth Amendment's prohibition on unrea-
sonable searches and seizures. 276 Va. 689, 696–698, 668
S. E. 2d 141, 146–147 (2008); see Pet. for Cert. 4 (citing
record).

I am not sure that the Fourth Amendment requires such
independent corroboration before the police can act, at
least in the special context of anonymous tips reporting
drunk driving. This is an important question that is not
answered by our past decisions, and that has deeply di-
vided federal and state courts. The Court should grant the
petition for certiorari to answer the question and resolve
the conflict.

On the one hand, our cases allow police to conduct in-
vestigative stops based on reasonable suspicion, viewed
under the totality of the circumstances. *Terry* v. *Ohio*, 392
U. S. 1, 22 (1968); *Alabama* v. *White*, 496 U. S. 325, 328–
331 (1990). In *Florida* v. *J. L.*, 529 U. S. 266, 270 (2000),
however, we explained that anonymous tips, in the ab-
sence of additional corroboration, typically lack the "indi-
cia of reliability" needed to justify a stop under the rea-
sonable suspicion standard. In *J. L.*, the Court suppressed
evidence seized by police after receiving an anonymous tip
alleging that a young man, wearing a plaid shirt and
waiting at a particular bus stop, was carrying a gun. The
majority below relied extensively on *J. L.* in reversing
Harris's conviction.

But it is not clear that *J. L.* applies to anonymous tips
reporting drunk or erratic driving. *J. L.* itself suggested

that the Fourth Amendment analysis might be different in other situations. The Court declined "to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id.*, at 273. It also hinted that "in quarters where the reasonable expectation of Fourth Amendment privacy is diminished," it might be constitutionally permissible to "conduct protective searches on the basis of information insufficient to justify searches elsewhere." *Id.*, at 274.

There is no question that drunk driving is a serious and potentially deadly crime, as our cases have repeatedly emphasized. See, *e.g.*, *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444, 451 (1990) ("No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion"). The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases. In a case like *J. L.*, the police can often observe the subject of a tip and step in before actual harm occurs; with drunk driving, such a wait-and-see approach may prove fatal. Drunk driving is always dangerous, as it is occurring. This Court has in fact recognized that the dangers posed by drunk drivers are unique, frequently upholding anti-drunk-driving policies that might be constitutionally problematic in other, less exigent circumstances.[1]

---

[1] See, *e.g.*, *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444, 455 (1990) (approving use of field-sobriety checkpoints of all approaching drivers, despite fact that over 98 percent of such drivers were innocent); *South Dakota* v. *Neville*, 459 U. S. 553, 554, 560 (1983) (upholding state law allowing a defendant's refusal to take a blood-alcohol test to be introduced as evidence against him at trial); *Mackey* v. *Montrym*, 443 U. S. 1, 17–19 (1979) (upholding state law requiring mandatory suspension of a driver's license upon a drunk-driving suspect's refusal to submit to a breath-analysis test); see also *Indianapolis* v. *Edmond*, 531 U. S. 32, 37–38 (2000) (noting that in the Fourth Amendment context

ROBERTS, C. J., dissenting

In the absence of controlling precedent on point, a sharp disagreement has emerged among federal and state courts over how to apply the Fourth Amendment in this context. The majority of courts examining the question have upheld investigative stops of allegedly drunk or erratic drivers, even when the police did not personally witness any traffic violations before conducting the stops.[2]   These courts have typically distinguished *J. L.*'s general rule based on some combination of (1) the especially grave and imminent dangers posed by drunk driving; (2) the enhanced reliability of tips alleging illegal activity in public, to which the tipster was presumably an eyewitness; (3) the fact that traffic stops are typically less invasive than searches or seizures of individuals on foot; and (4) the diminished expectation of privacy enjoyed by individuals driving their cars on public roads.  A minority of jurisdictions, meanwhile, take the same position as the Virginia Supreme Court, requiring that officers first confirm an anonymous tip of drunk or erratic driving through their own independent observation.[3]   This conflict has been expressly noted by the lower courts.[4]

———————

the Court has upheld government measures "aimed at removing drunk drivers from the road," distinguishing such measures from those with the primary purpose of "detect[ing] evidence of ordinary criminal wrongdoing").

[2] See, *e.g.*, *United States* v. *Wheat*, 278 F. 3d 722 (CA8 2001); *People* v. *Wells*, 38 Cal. 4th 1078, 136 P. 3d 810 (2006); *State* v. *Prendergast*, 103 Haw. 451, 83 P. 3d 714 (2004); *State* v. *Walshire*, 634 N. W. 2d 625 (Iowa 2001); *State* v. *Crawford*, 275 Kan. 492, 67 P. 3d 115 (2003); *Bloomingdale* v. *State,* 842 A. 2d 1212 (Del. 2004); *State* v. *Golotta*, 178 N. J. 205, 837 A. 2d 359 (2003); *State* v. *Scholl*, 2004 SD 85, 684 N. W. 2d 83; *State* v. *Boyea*, 171 Vt. 401, 765 A. 2d 862 (2000); *State* v. *Rutzinski*, 2001 WI 22, 241 Wis. 2d 729, 623 N. W. 2d 516.

[3] See, *e.g.*, *McChesney* v. *State,* 988 P. 2d 1071 (Wyo. 1999); *Commonwealth* v. *Lubiejewski*, 49 Mass. App. 212, 729 N. E. 2d 288 (2000); *State* v. *Sparen*, No. CR00258199S, 2001 WL 206078 (Conn. Super. Ct., Feb. 9, 2001) (unpublished).

[4] See, *e.g.*, *Wheat*, *supra*, at 729–730 (reviewing cases upholding stops,

The conflict is clear and the stakes are high. The effect of the rule below will be to grant drunk drivers "one free swerve" before they can legally be pulled over by police. It will be difficult for an officer to explain to the family of a motorist killed by that swerve that the police had a tip that the driver of the other car was drunk, but that they were powerless to pull him over, even for a quick check.

Maybe the decision of the Virginia Supreme Court below was correct, and the Fourth Amendment bars police from acting on anonymous tips of drunk driving unless they can verify each tip. If so, then the dangerous consequences of this rule are unavoidable. But the police should have every legitimate tool at their disposal for getting drunk drivers off the road. I would grant certiorari to determine if this is one of them.

---

then noting that some courts "have reached a different conclusion"); *Wells*, *supra*, at 1084, 136 P. 3d, at 814 ("split of authority").